OPINION *Page 2 
{¶ 1} Defendant-appellant Andrea Kimble appeals the decision of the Mahoning County Common Pleas Court finding her guilty of complicity to commit murder, a violation of R.C. 2903.02(B) and R.C. 2923.03; complicity to commit aggravated robbery, a violation of R.C.2911.01(A)(4) and R.C. 2923.03, and firearm specifications, a violation of R.C. 2941.145(A). Four issues are raised in this appeal. The first is whether sufficient evidence was produced by the state to prove the elements of the offense beyond a reasonable doubt. The second issue is whether the convictions are against the manifest weight of the evidence. The third issue is whether the trial court incorrectly instructed on the firearm specifications. The fourth issue is a sentencing issue; whether the trial's court reference to a statute rendered unconstitutional byState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, causes the sentence to be erroneous and requires resentencing. For the reasons expressed below, the conviction is hereby affirmed; however, the sentence is vacated and the case is remanded for resentencing.
 STATEMENT OF FACTS {¶ 2} On August 16, 2005, Kimble asked co-defendant Laticia Alexander to have sexual relations with Matthew Saunders, the victim, for money. Laticia agreed to the proposition and went to Kimble's sister's residence on Oak Hill in Youngstown, Ohio, to wait for Matthew to pick her up. While there, Kimble told Laticia that she did not have to have sex with Matthew. Kimble informed Laticia that during her "date" with Matthew, he would be robbed. Laticia was told that when Matthew picked her up she was to take him to Pyatt Street and the robbery would occur there. Co-defendant Marcus Thomas was present and involved in this conversation.
 {¶ 3} Sometime after the conversation was over, Matthew pulled up to the house, honked his horn and Laticia left with him. Laticia directed Matthew to Pyatt Street. After they had driven off, Marcus exited the residence, got into a car with Jawan Johnson and followed Laticia and Matthew to Pyatt Street. Marcus and Jawan parked close to Pyatt Street, and walked over to the car Laticia and Matthew were in. Marcus and Jawan ordered Matthew and Laticia out of the car; Marcus had a gun. Laticia was ordered to leave. As she was running away she heard a gunshot; Marcus had shot and killed Matthew. Both Marcus and Jawan fled the scene. *Page 3 
 {¶ 4} Laticia then called Kimble and told Kimble to pick her up. Laticia informed Kimble that she thought Matthew was shot. Kimble then took Laticia back to the house on Oak Hill. After awhile Marcus arrived at the house and had the gun with him. Laticia left shortly thereafter.
 {¶ 5} Late in the evening on that night, Matthew's body was found at Pyatt Street by Officer DiMailo of the Youngstown Police Department. Investigations were pursued to determine who and what caused Matthew's death. The coroner ascertained that the cause of death was a gunshot wound to the left temple.
 {¶ 6} On April 27, 2006, Kimble was indicted for one count of aggravated murder, a violation of R.C. 2903.01(A)(D) and one count of aggravated robbery, a violation of R.C. 2911.01(A)(1)(B). Firearm specifications were attached to both counts, violations of R.C.2941.145(A).
 {¶ 7} The case proceeded to trial. At trial, Laticia, who was also indicted for aggravated murder and aggravated robbery, testified against Kimble. Laticia entered into a plea agreement with the state to plead guilty to aggravated robbery in exchange for her testimony. Jawan also testified. Like Laticia, he was also indicted for aggravated murder and aggravated robbery and entered into a plea agreement with the state.
 {¶ 8} The jury found Kimble not guilty of complicity to commit aggravated murder, but found her guilty of complicity to commit murder and aggravated robbery. She was also found guilty of both gun specifications.
 {¶ 9} Kimble was sentenced on November 21, 2006. She received an aggregate term of 21 years to life. On the complicity to commit murder conviction, she received the mandatory 15 years to life. On the complicity to commit aggravated robbery, she received three years. For the two guns specification convictions, the court found that they merged and Kimble received a mandatory three years. All sentences were ordered to be served consecutively. Kimble now timely appeals from the conviction and sentence.
 FIRST ASSIGNMENT OF ERROR {¶ 10} "THE STATE OF OHIO FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT- *Page 4 
APPELLANT ANDREA KIMBLE AIDED OR ABETTED MARCUS THOMAS AND/OR JAWAN JOHNSON IN THE MURDER OR AGGRAVATED ROBBERY OF MATTHEW SAUNDERS, THEREBY VIOLATING MS. KIMBLE'S DUE PROCESS RIGHTS GUARANTEED BY THEFOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION. (TR. AT 281-527)."
 {¶ 11} Kimble argues that the evidence is insufficient to prove the elements of the offenses. When an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v.Smith, 80 Ohio St.3d 89, 1997-Ohio-355; State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52. In a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility, instead, it assumes the state's witnesses testified truthfully and determines whether or not that testimony satisfies each element of the crime. State v. Woodward, 10th Dist. No. 03AP-398,2004-Ohio-4418, at ¶ 16.
 {¶ 12} Kimble was convicted of complicity to commit aggravated robbery, complicity to commit murder, and firearm specifications. Our analysis will start with the complicity to commit aggravated robbery conviction, a violation of R.C. 2911.01 (A)(1)(C).
 Complicity to Commit Aggravated Robbery {¶ 13} Aggravated robbery is statutorily defined as "no person, in attempting or committing a theft offense, * * * shall * * * have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.01(A)(1). A violation of this is a first degree felony. R.C. 2911.01(C).
 {¶ 14} Theft means, "no person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * by threat. R.C. 2913.02(A)(4). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). *Page 5 
 {¶ 15} Deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C.2923.11(A).
 {¶ 16} Complicity is defined as, "no person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." R.C. 2923.03.
 {¶ 17} Thus, in order for there to be sufficient evidence, the state had to produce evidence that when viewed in the light most favorable to the state any rational trier of fact could find that Kimble acted knowingly in aiding and abetting Marcus or Jawan in robbing Matthew with a deadly weapon. The testimony at trial established that Kimble set up a sexual encounter with Laticia and Matthew. (Tr. 283-284). Laticia testified that prior to Matthew picking her up to have this sexual encounter, Kimble told her that she did not have to have sex with Matthew because he was being set up for a robbery. (Tr. 284, 287). Laticia stated that Kimble told her to take Matthew to Pyatt Street and that the robbery would occur there. (Tr. 287). Laticia indicated that during this conversation, Marcus Thomas was present. (Tr. 287). She stated that her understanding of the conversation between Kimble and Marcus was that she was to get Matthew to Pyatt Street and then Marcus would arrive, get her out of the car, let her go and then the robbery would occur after that. (Tr. 289). She stated that she knew there was going to be a robbery, but there was no talk of anyone getting shot or killed. (Tr. 294).
 {¶ 18} Laticia indicated that she did take Matthew to Pyatt Street and she stalled until Marcus showed up. (Tr. 290). She stated that Marcus arrived with Jawan Johnson. (Tr. 291). Marcus had a gun, instructed her to get out of the car, told her to lie on the ground and then told her to leave. (Tr. 292). She followed his instructions. (Tr. 292). She testified that Jawan pulled Matthew out of the car. (Tr. 292).
 {¶ 19} She stated that after she left, she heard a single gunshot. (Tr. 293). She explained that she continued to run and did not look back to see who was shot or who was the shooter. (Tr. 293). She then called Kimble to pick her up and she stated to Kimble that she thought Matthew got shot. (Tr. 295). Kimble's response was that, "It wasn't supposed to happen like that." (Tr. 295). Laticia then testified that Kimble took her to the Oak Hill residence and later on Marcus came in waving a gun. (Tr. 296). *Page 6 
 {¶ 20} Jawan also testified at trial. He indicated that he and Marcus were hanging out that day. (Tr. 364). Marcus received a phone call and after he hung up, Marcus told Jawan that they were going to rob Matthew that night. (Tr. 363). Jawan could not testify that it was Kimble who called Marcus and discussed the planned robbery. (Tr. 363). Later on, Jawan and Marcus went to Kimble's sister's house. (Tr. 365). Marcus went inside, but Jawan stayed outside. (Tr. 367). Jawan indicated that Laticia came out of the house after a little bit and got into a car with who he later learned was Matthew. (Tr. 366).
 {¶ 21} Jawan stated that shortly thereafter, Marcus came out of the house and told him to follow Matthew and Laticia to Pyatt Street. (Tr. 368). Marcus and Jawan parked a little bit away from Pyatt Street and walked over to the car where Matthew and Laticia were located. (Tr. 370). Jawan stated that he got Laticia out of the car, while Marcus got Matthew out of the car. (Tr. 371). He indicated that he noticed upon their arrival at the car that Marcus had a gun. (Tr. 377). Jawan specified that Laticia left after a couple of minutes and he proceeded to look through the car for money. He indicated that he was told there would be around $4,000 to $5,000. (Tr. 372-373). He testified that he only found $40 in a cigarette pack. (Tr. 373). He then heard a gunshot and saw Matthew lying on the ground. He and Marcus then left the scene. They went to see Kimble to tell her what happened. (Tr. 380).
 {¶ 22} Edward Thomas also testified. He indicated that he was hanging out at Kimble's sister's house, the Oak Hill residence, that day. (Tr. 452). He stated that Marcus showed up later and when he arrived he said "I killed this nigger." (Tr. 455). Thomas indicated that Kimble was shocked by Marcus' statement. (Tr. 460). He testified that prior to Marcus coming in he did not know what was going on — meaning that the others planned a robbery. (Tr. 461).
 {¶ 23} Officer Rob DiMailo found Matthew's body on Pyatt Street by his car. (Tr. 477). Dr. Robert Belding, the Mahoning County deputy coroner, testified that he performed an autopsy on Matthew. He further indicated that Matthew died from a laceration of the brain due to a gunshot wound to the left temple and that there were no defensive wounds. (Tr. 436-437). He stated that from the powder residue, the gun was not touching the skin but was probably about an inch away from the temple when fired. (Tr. 436). *Page 7 
 {¶ 24} The above evidence, when viewed in the light most favorable to the prosecution, was sufficient to prove the elements of complicity to commit aggravated robbery. Under Ohio law, "[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." State v. Pruett (1971),28 Ohio App.2d 29, 34. "[To] support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v.Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336, syllabus. Such criminal intent can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed. Id. at 245.
 {¶ 25} The above evidence clearly confirmed that Marcus and Jawan robbed Matthew at gun point. Their action of going to Pyatt Street and getting Matthew out of the car and pointing a gun at him were done knowingly to commit the theft. Kimble's discussion with Laticia prior to the robbery validated Kimble's assistance to the commission of the theft. Kimble set up the sexual rendezvous between Matthew and Laticia. Then, she instructed Laticia that she did not have to have sex with him because he was being set up for a robbery. Further, she instructed Laticia to take Matthew to Pyatt Street where the robbery would occur. Marcus, the robber and shooter, was involved with this conversation. All of Kimble's actions unmistakably display her assistance in the robbery.
 {¶ 26} While there may not be testimony to clearly prove that Kimble knew Marcus was going to use a gun in the robbery, the state was not required to prove that. As the Second Appellate District has explained:
 {¶ 27} "Violation of the complicity statute requires that the accomplice be treated `as though he was the one who committed everyact of the underlying principal offense.' (Emphasis added.) State v.Jackson (1993), 90 Ohio App.3d 702, 705, citing State v. Chapman (1986),21 Ohio St.3d 41 and State v. Moore (1985), 16 Ohio St.3d 30. In other words, the court can impute the elements of the principal offense, committed by the principal, to the aider and abettor. Id.
 {¶ 28} "* * *
 {¶ 29} "In order to elevate a theft offense to aggravated robbery, the state must show that the defendant had a deadly weapon or dangerous ordnance on or about his *Page 8 
person or under his control while attempting or committing the theft offense, or fleeing immediately after the attempt or offense. R.C.2911.01. See, also, State v. Merriweather (1980), 64 Ohio St.2d 57, 59. As this language reveals, the weapon need not be in his actual physical possession, but only under his control, meaning `the area from within which [the offender] might gain possession of a weapon * * *.' State v.Brown (1992), 63 Ohio St.3d 349, 351. By using language simply requiring mere possession and not actual use or intent to use a deadly weapon, the General Assembly demonstrated its intention that no mens rea is required for that element of the offense. State v. Wharf (1999),86 Ohio St.3d 375, 378. Instead, the only mens rea the state must prove is that required for the theft offense; possession of the deadly weapon is strict liability. Id. at 377.
 {¶ 30} "In examining the legislative history of the robbery statutes, the supreme court explained that the legislature `intended to punish the potential for harm to persons as well as actual harm.' Id. at 378, citing Committee Comment to Am. Sub. H.B. No. 511, R.C. 2911.01 and2911.02. The court further found our case of State v. Edwards (1976),50 Ohio App.2d 63, persuasive. We held:
 {¶ 31} "The thrust and philosophy of H.B. 511 is to remove the potential for harm that exists while one is committing a theft offense. The anti-social act is the theft offense, committed while armed with a weapon. Merely having the weapon is the potentially dangerous factual condition warranting the more severe penalty. As to the weapon, no mental condition or actual use is necessary or required under the statute.'
 {¶ 32} "Id. at 66-67. Accordingly, the state did not need to prove that Letts `knew' LaShawna possessed the gun in order to find him guilty of aggravated robbery. As an accomplice, he may be found to have committed every element of the offense committed by the principal, including possession of the weapon." State v. Letts (June 22, 2001), 2d Dist. No. 15681.
 {¶ 33} Thus, Kimble did not need to know a gun was to be used; rather, all that is necessary is that she be involved in the robbery. Therefore, as to the complicity to commit aggravated robbery, there was sufficient evidence to prove the elements of the offense beyond a reasonable doubt.
 Complicity to Commit Felony Murder {¶ 34} Kimble was also convicted of complicity to commit murder, a violation of R.C. 2903.02(B), commonly known as felony murder. This section states, "No person *Page 9 
shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 35} Under Ohio's felony murder doctrine, a defendant can be held liable for a death that results from the actions of his co-felon.State v. Washington, 8th Dist. No. 79300, 2002-Ohio-505. In State v.Dixon, 2d Dist. No. 18582, 2002-Ohio-541 (abrogation recognized on other grounds), the court explained that under the "proximate cause theory" of felony murder:
 {¶ 36} "[I]t is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. A defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the `proximate result' of defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience. Id.;State v. Bumgardner, Greene App. No. 97-CA-103, 1998 Ohio App. LEXIS 3856; State v. Lovelace (1999), 137 Ohio App.3d 206, 738 N.E.2d 418."
 {¶ 37} Consequently, a defendant may be held criminally liable for the unintended death that results from the commission of a first or second degree felony. As such, since there was sufficient evidence for the complicity to commit aggravated robbery, which is a first degree felony, and the murder was foreseeable and occurred during the commission of that felony, then there was sufficient evidence for the complicity to commit felony murder.
 Firearm Specifications {¶ 38} Next, Kimble argues that the evidence was insufficient to show that she knew a firearm was going to be used in the robbery. Therefore, according to her, the elements for a gun specification cannot be proved beyond a reasonable doubt.
 {¶ 39} R.C. 2941.145 defines a firearm specification. This section states:
 {¶ 40} "Imposition of a three-year mandatory prison term upon an offender under division (D)(1)(a) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies *Page 10 
that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2945.145(A).
 {¶ 41} Kimble appears to be of the impression that she had to have knowledge that a gun was going to be used, and the state had to prove that knowledge in order for her to be found guilty of the firearm specification. Her assumption is incorrect. The Ohio Supreme Court inChapman, 21 Ohio St.3d 41, has indicated that an individual indicted for and convicted of violating R.C. 2911.01, aggravated robbery, and of a firearm specification under R.C. 2941.141, is subject to sentencing enhancement pursuant to former R.C. 2929.71, regardless of whether he or she was the principal offender or an unarmed accomplice. Syllabus. Thus, an accomplice to a crime is subject to the same prosecution and punishment as the principal offender under R.C. 2923.03(F). State v.Jackson, 169 Ohio App.3d 440, 2006-Ohio-6059, ¶ 34, citing State v.Hanning, 89 Ohio St.3d 86, 92, 2000-Ohio-436.
 {¶ 42} Furthermore, the same argument Kimble makes here was expressly rejected by the Second Appellate District in Letts. It held, "As an accomplice, he may be found to have committed every element of the offense committed by the principal, including possession of the weapon."Letts, 2d Dist. No. 15681. Since an accomplice can be determined to meet the element of possession of a weapon because the principal has a weapon, then an accomplice can be found guilty of the firearm specification even though they are unarmed and had no knowledge that the firearm was being used. As the Chapman Court explained, R.C. 2923.03(F), the complicity statute states, "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecutedand punished as if he were a principal offender." Chapman,21 Ohio St.3d at 42-43. Thus, regardless of whether one is the principal offender or an unarmed accomplice, he/she is subject to a firearm specification conviction.
 {¶ 43} Here, the evidence established that Marcus used a firearm in the commission of the robbery and that he shot and killed Matthew during the commission of that first degree felony. Hence, as we found above that there was sufficient evidence for complicity to commit robbery and felony murder, there is sufficient evidence for the firearm specifications. Any argument to the contrary lacks merit. *Page 11 
 {¶ 44} For all the above reasons, this court finds that the state submitted sufficient evidence, which would allow any rational trier of fact to find the essential elements of the offenses beyond a reasonable doubt. Thus, this assignment of error lacks merit.
 SECOND ASSIGNMENT OF ERROR {¶ 45} "THE JURY VERDICT FINDING DEFENDANT-APPELLANT ANDREA KIMBLE GUILTY OF COMPLICITY TO MURDER AND COMPLICITY TO AGGRAVATED ROBBERY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF ARTICLE IV, § 3(B)(3) OF THE OHIO CONSTITUTION. (TR. AT 281-552)."
 {¶ 46} Kimble argues that the verdict was not supported by the manifest weight of the evidence. Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony.Thompkins, 78 Ohio St.3d at 387, 1997-Ohio-52, superceded by constitutional amendment on other grounds as stated by Smith,80 Ohio St.3d 89, 1997-Ohio-355. The appellate court, "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." Thompkins, 78 Ohio St.3d at 387,1997-Ohio-52, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 47} As with the first assignment of error, Kimble is attacking each of her convictions. Her main contention is that the weight of the evidence does not support the convictions because there were inconsistencies between Jawan, Laticia and Edward's testimony. Furthermore, she contends that these witnesses' testimony were suspect because they entered into deals in exchange for their testimony.
 {¶ 48} There are discrepancies between Jawan's and Laticia's testimony. One discrepancy is about what Matthew was wearing. Laticia testified that Matthew was wearing a white t-shirt and black shorts. (Tr. 311, 319). Jawan testified that Matthew was wearing pants and when he was pulled out of the car his pants were around his ankles. (Tr. 395). *Page 12 
 {¶ 49} Detective/Sergeant Martin, who investigated this crime, stated that Matthew was found in blue shorts and a white shirt. (Tr. 487). The pictures, submitted as an exhibit, show Matthew in black/dark blue shorts and a white t-shirt. These confirm Laticia's testimony about what Matthew was wearing.
 {¶ 50} Another discrepancy in Laticia's and Jawan's testimony regards who pulled Matthew out of the car and who pulled Laticia out of the car. Laticia testified that Marcus knocked on her window with the gun, ordered her out of the car, ordered her to the ground and then told her to leave. (Tr. 292). She indicated that Jawan ordered Matthew out of the car. (Tr. 292). Jawan testified that he knocked on Laticia's window, ordered her out of the car, and told her to leave, while Marcus got Matthew out of the car. (Tr. 392, 393). He testified that she never got on the ground. (Tr. 394). Jawan, however, did testify that while Marcus did get Matthew out of the car, Marcus was on the passenger side of the car, Laticia's side, while she was in the car for "a hot second." (Tr. 413-414).
 {¶ 51} There is also a discrepancy between Laticia's and Edward Thomas' testimony. Laticia testified that after leaving the robbery, she ran to Market Street and called Kimble to come and get her. (Tr. 294). Laticia indicated that Kimble picked her up. (Tr. 294). Edward testified that he had been hanging out at Laticia's sister's house and that at no time that night did Kimble leave the premises. (Tr. 470-471). But he also said that people might have been "coming and going at that time to get something to get or whatever." (Tr. 473). Thus, indicating he might not have been aware that Kimble left the premises for a short period of time.
 {¶ 52} The above discrepancies in the testimony are at most minor and do not indicate that the verdict was against the manifest weight of the evidence. They do not affect the weight of Laticia's testimony that Kimble set up the sexual tryst between her and Matthew, told Laticia she did not have to have sex with Matthew because he was being set up for a robbery, and told Laticia where to take Matthew to for the robbery. The discrepancies do not weigh against the testimony that Laticia, Marcus and Kimble had this discussion about the robbery. Furthermore, it does not change the fact that Kimble acknowledged after Matthew was shot that "it wasn't supposed to happen like that." (Tr. 295).
 {¶ 53} Kimble also concentrates on the fact that Jawan stated on cross-examination that when he talked to the police, at one point he told them that the orders *Page 13 
to commit the robbery came from Marcus and a Monique Neal. (Tr. 419). In response to a question on this subject, Jawan clarified that he stated that he thought it was Monique who made the phone call to Marcus because she often called Jawan's house for Marcus. (Tr. 419). However, he testified that he did not know for sure who was on the phone and that it could have been Kimble. (Tr. 363, 419).
 {¶ 54} His testimony about Marcus receiving the phone call was to show that there was a plan to rob Matthew. There was no direct evidence that Kimble was the person who called and planned the robbery with Marcus. However, other evidence does show that Kimble set up the sexual tryst between Matthew and Laticia, that sometime during that day Marcus received a phone call and after the call, he told Jawan there was a plan to rob Matthew. Testimony also showed that later that day when Laticia went to the Oak Hill house, she was informed by Kimble that Matthew was being set up for a robbery and to take him to Pyatt Street. Laticia indicated that Marcus was present for this conversation. Furthermore, the evidence showed that Matthew was robbed at Pyatt Street by Marcus and Jawan, and that Marcus shot and killed Matthew in the commission of the theft. A logical conclusion from that evidence is that Kimble was the person who called Marcus to set up the robbery.
 {¶ 55} Next, Kimble contends that Laticia, Jawan and Edward Thomas' testimony was suspect because they all received deals in exchange for their testimony. Kimble is correct that each received deals in exchange for their testimony. Laticia was indicted for aggravated robbery and murder with firearm specifications for actions in relation to this case. She entered into a deal where she pled guilty to aggravated robbery with the gun specification and the murder charge was dismissed. As of the time of trial, she had not been sentenced but she faced a maximum sentence of 13 years. Jawan was also indicted for aggravated robbery and murder with gun specifications. He pled guilty to aggravated robbery and the gun specification; the murder count was dismissed. He was sentenced to 13 years. Although he would not be eligible for Judicial Release, the trial court agreed to entertain a motion to modify after he testified against his co-defendants. (Tr. 541-542). Edward Thomas is currently serving four years in prison for receiving stolen property and carrying a concealed weapon. That conviction is not in relation to this case. However, in return for his cooperation in this case, the state agreed to help him get released after two years. (Tr. 449). *Page 14 
 {¶ 56} The above does show that Jawan and Laticia were charged with the same crimes as Kimble, but that they received deals in exchange for their testimony. However, both Jawan and Laticia testified that they were supposed to testify truthfully and that they were testifying truthfully. (Tr. 357, 424). Thus, the fact that they entered into plea agreements alone does not render their testimony incredible.
 {¶ 57} In conclusion, even though there were discrepancies in the testimony, and the fact that co-defendants and witnesses received deals in exchange for their testimony, given all the evidence and testimony, it does not indicate that the verdict was against the manifest weight of the evidence. As was explained above and under the first assignment of error, the testimony shows that Kimble assisted knowingly in the planning of the robbery, which occurred with a gun and resulted in Matthew getting killed from a gunshot wound. Consequently, this assignment of error lacks merit.
 THIRD ASSIGNMENT OF ERROR {¶ 58} "THE TRIAL COURT VIOLATED DEFENDANT-APPELLANT ANDREA KIMBLE'S DUE PROCESS RIGHTS, GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 16 OF THE OHIO CONSTITUTION, WHEN IT FAILED TO CLEARLY INSTRUCT THE JURY ON WHETHER IT NEEDED TO FIND THAT ANDREA KIMBLE KNEW THAT MARCUS THOMAS AND/OR JAWAN JOHNSON WOULD USE A FIREARM IN COMMITTING THE MURDER AND AGGRAVATED ROBBERY OF MATTHEW SAUNDERS BEFORE IT COULD FIND ANDREA KIMBLE GUILTY OF THE FIREARM SPECIFICATIONS ATTACHED TO EACH OFFENSE CHARGED. (TR. AT 653-654)."
 {¶ 59} This assignment of error raises an issue with the jury instruction on the firearm specification and contends that the trial court's answer to the jury's question regarding that instruction was an abuse of discretion because it invited the jurors to interpret the law any way they chose. The jury instruction for the firearm specification was as follows:
 {¶ 60} "Only if your verdict is guilty on Count 1 will you separately decide beyond a reasonable doubt if the codefendants, Marcus Thomas and/or Jawan Johnson, while committing the offense of aggravated murder, had a firearm on or about his person or under his control, and that the defendant, Andrea Kimble, *Page 15 
purposely aided and abetted him in that regard. If your verdict is not guilty you will not decide this issue, and you should leave that verdict form blank.
 {¶ 61} "Firearm means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. Firearm includes an unloaded firearm and any firearm that is inoperable, but which can readily — which can readily — excuse me — but which can be readily rendered operable.
 {¶ 62} "When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you must rely on circumstantial evidence including but not limited to, the statements and actions of the individual exercising control over the firearm.
 {¶ 63} "Deadly weapon means any instrument, devise or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon.
 {¶ 64} "On or about his person or under his control means that the firearm was either carried on the codefendant's person or was near the codefendant's person as to be conveniently accessible and within his immediate physical reach, and that Andrea Kimble purposely aided and abetted in this regard." (Tr. 621-622).
 {¶ 65} The trial court then instructed on complicity to commit murder and complicity to commit aggravated robbery. The trial court instructed the jury that the firearm specification had previously been defined for them. Kimble did not object to the instruction. Rather, it is almost a word for word recitation of the proposed jury instruction that she submitted to the trial court.
 {¶ 66} After deliberating for a while, the jury asked a question of the court.
 {¶ 67} "THE COURT: I have a question. It says, `Gun Specification. Do we decide if a gun was used or not or if Andrea had knowledge a gun would be used?'
 {¶ 68} "All I can tell you is look at the instruction I gave you because-
 {¶ 69} "JUROR: We did. There's a contradiction.
 {¶ 70} "JUROR: They contradict one another.
 {¶ 71} "THE COURT: Are you looking at it in regards to the verdict form that you signed?
 {¶ 72} "JUROR: We're looking at that and this, the instructions. There's a contradiction between them.
 {¶ 73} "THE COURT: Let me see the instructions. *Page 16 
 {¶ 74} "(WHEREUPON, a discussion was had among court and counsel offthe record and out of the hearing of the jury and court reporter, afterwhich the proceedings continued as follows:)
 {¶ 75} "THE COURT: With regards to the question and the difference between the specification verdict form and the jury instructions, you're to interpret it to the best of your ability.
 {¶ 76} "JUROR: I knew it." (Tr. 653-654).
 {¶ 77} The jury verdict form for the firearm specification on the complicity to commit murder charge read as follows:
 {¶ 78} "WE, THE JURY, FIND THE CODEFENDANTS, MARCUS THOMAS AND/OR JAWAN JOHNSON * __________________ HAVE A FIREARM AS SET FORTH IN THE SPECIFICATION, IN VIOLATION OF R.C. 2941.145(A), AND THAT ANDREA KIMBLE PURPOSELY AIDED AND ABETTED MARCUS THOMAS AND/OR JAWAN JOHNSON IN COMMITTING AGGRAVATED ROBBERY.
 {¶ 79} "* INSERT IN INK, DID OR DID NOT"
 {¶ 80} As can be seen from comparing the jury instruction to the verdict form, the instruction when informing on the firearm specification stated that for the firearm to be on or about Jawan/Marcus' person or under his control meant that the firearm was either carried on Jawan/Marcus' person or was near his person as to be conveniently accessible and within his immediate physical reach, and that Kimble purposely aided and abetted "in this regard." The form, on the other hand, stated that for Kimble to be found guilty Marcus/Jawan had to have a firearm and that Kimble aided and abetted him in committing the aggravated robbery. It appears the jury might have been confused by the "in this regard" language in the instruction.
 {¶ 81} Kimble contends that the jury could have interpreted the instruction and the form in two different ways. First, it could have been interpreted to mean that if a gun was used and that Kimble purposely aided and abetted in the robbery, then she would be guilty of the gun specification. Or, the jury could have interpreted it to mean that to find Kimble guilty of the specification, it had to find that Kimble purposely aided and abetted in the use or procurement of that gun.
 {¶ 82} As stated above, Kimble did not object to the jury instruction. Typically, if a party does not object to a jury instruction before the jury retires to consider its verdict, then that party has waived all arguments regarding those instructions except *Page 17 
for plain error. State v. Hull, 7th Dist. No. 04MA2, 2005-Ohio-1659, ¶ 44, citing State v. Harman, 93 Ohio St.3d 274, 289, 2001-Ohio-1580. This rule, however, does not apply, "when the jury asks for further instruction or for clarification of a previously given instruction. When this happens, a trial court has discretion in formulating its response and its decision will only be reversed for an abuse of that discretion.State v. Carter, 72 Ohio St.3d 545, 1995-Ohio-104, paragraph one of the syllabus." Hull, 7th Dist. No. 04MA2, 2005-Ohio-1659, ¶ 44.
 {¶ 83} "The jury instruction as a whole must be considered to determine if there was prejudicial error. State v. Noggle,140 Ohio App.3d 733, 750, 2000-Ohio-1927. The trial court's response, when viewed in its entirety, must constitute a correct statement of the law, consistent with or properly supplementing the jury instructions that have previously been given. See Watkins v. Cleveland Clinic Found.
(1998), 130 Ohio App.3d 262, 277." Id. at ¶ 45.
 {¶ 84} The court's instruction to the jury following its question does not amount to an abuse of discretion. The trial court in essence was instructing the jury to look at the jury instructions and verdict form to determine the law and to reconcile any contradiction the two presented. Furthermore, even if there was a contradiction between the two, which as Kimble suggests leads to two different interpretations of the law, we cannot find prejudice.
 {¶ 85} As we have explained above, Kimble did not need to know that Marcus was going to use a gun to be found guilty of the gun specification. As stated above, under the complicity statute, the accomplice is treated "as though he was the one who committed every act of the underlying principal offense." Jackson, 90 Ohio App.3d at 705, citing Chapman, 21 Ohio St.3d 41. Thus, the elements of the principal offense, committed by the principal, are imputed to the aider and abettor. Id. Or, in other words, if the jury found that Marcus had a gun in the commission of the offense, regardless of whether Kimble knew that one would be used, she is guilty of the gun specification. Kimble admits that the instruction given leads to this as one interpretation. This interpretation requires the jury to find less than the other interpretation.
 {¶ 86} The other interpretation Kimble contends the instruction and form gave was that Kimble had to know that a gun was used in order for her to be found guilty of the specification. That interpretation is not consistent with the law as it stands (as was *Page 18 
explained above). However, for the sake of argument, if we were to assume that that is how the jury interpreted the instruction, they would be required to find more than what was needed to be found, i.e. they were finding knowledge of the gun, an additional element. Since the law does not require knowledge of the gun for an accomplice to be found guilty of the firearm specification, this interpretation would prejudice the state, not the defendant, by requiring the state to prove an additional element. Accordingly, any error that occurred here would not be prejudicial. Thus, this assignment of error has no merit.
 FOURTH ASSIGNMENT OF ERROR {¶ 87} "THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE PRISON TERMS ON DEFENDANT-APPELLANT ANDREA KIMBLE BASED UPON FINDINGS MADE PURSUANT TO R.C. § 2929.14(B), WHICH WAS DECLARED UNCONSTITUTIONAL BY THE OHIO SUPREME COURT. (JUDGMENT ENTRY OF SENTENCE, NOVEMBER 22, 2006, APP. AT A-1)."
 {¶ 88} The trial court sentenced Kimble to fifteen years to life for the complicity to commit murder conviction, three years for the complicity to commit aggravated robbery conviction, and three years for each firearm specification. The firearm specifications were merged and the court ordered all sentences to be served consecutively. Thus, Kimble received a net sentence of twenty-one years to life.
 {¶ 89} The trial court, in ordering the sentences, stated that it considered the record, oral statements, pre-sentence investigation, as well as the principles and purposes of sentencing under R.C. 2929.11 and had balanced the seriousness and recidivism factors under R.C. 2929.12. 11/22/06 J.E. The trial court then stated:
 {¶ 90} "The Court further finds that pursuant to O.R.C. 2929.14(B) that the shortest prison term possible will demean the seriousness of the offense AND will not adequately protect the public and therefore imposes a greater term." 11/22/06 J.E.
 {¶ 91} Kimble argues that the trial court's reference to R.C.2929.14(B) was improper and constituted reversible error because that section of the statute was rendered unconstitutional by the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856.
 {¶ 92} As this court has explained many times before, inFoster, the Ohio Supreme Court determined that R.C. 2929.14(B) was unconstitutional because it *Page 19 
required judicial fact finding. Thus, the Ohio Supreme Court excised that section, along with others, from R.C. 2929.14.
 {¶ 93} At the time Kimble was sentenced, November 22, 2006,Foster had been in effect for almost nine months, (Foster was decided February 27, 2006). Thus, R.C. 2929.14(B) and its requirement to make findings prior to sentencing an offender to more than the minimum sentence should not have been relied on. In a case similar to the one before us now, we were asked to determine whether "we must remand for resentencing where the trial court cited to R.C. 2929.14(B), which was declared unconstitutional and excised by State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856, and where the court made findings for deviating from a minimum sentence that were previously required by this statute."State v. Moore, 7th Dist. No. 06MA60, 2007-Ohio-1574 (Judges Vukovich and Waite for majority, Judge DeGenaro dissenting).
 {¶ 94} In vacating and remanding for a new sentencing hearing, the majority explained:
 {¶ 95} "The trial court's entry reads as if the court was unaware of the Foster holding. In fact, the sentencing hearing was a mere two weeks after release of the Foster opinion. The effect of the court's entry here is analogous to the entry of a court that sentenced a defendantpre-Foster. The Ohio Supreme Court explicitly instructed us to reverse and remand for resentencing all cases pending on direct appeal.Foster at ¶ 104, 106. Where a sentencing court's language seemingly ignores the implications of Foster, we must similarly reverse and remand.
 {¶ 96} "We cannot say that the trial court's citation to R.C.2929.14(B) was harmless. Such argument flies in the face of theFoster court's rationale and the effect of that holding. In fact, critics of Foster employ the harmless error rationale that most of the severed statutes only served to benefit the Foster defendants as they made it more difficult for the sentencing court to impose sentences that were greater than the minimum, maximum or consecutive. Yet, this principle did not deter the Ohio Supreme Court in fashioning its decision and its remedy of resentencing.
 {¶ 97} "The trial court here placed a limit on itself. However, the Supreme Court's resentencing order requires that such limits be lifted as they are unconstitutional. Trial courts cannot choose to ignore (or accidentally ignore) Foster and act as if judicial fact-finding is still required. This is the case regardless of whether the fact-finding actually increases the defendant's chances for a lesser sentence. *Page 20 
 {¶ 98} "The error is just as unconstitutional post-Foster as it waspre-Foster. Thus, one could not categorize the error as non-constitutional in order to distinguish the Foster remedy and avoidFoster's resentencing mandate. Logically, a trial court's act of restricting itself to and relying on a recently declared unconstitutional statute cannot be non-constitutional error merely because in reality the statute has been erased by the Supreme Court. The fact remains that the trial court overlooked that act of erasure. Disregarding the Supreme Court's constitutionally-required severance pronouncement is just as unconstitutional as originally applying the unconstitutional statute." Moore, 2007-Ohio-1574, ¶ 10-13.
 {¶ 99} The only difference between Moore and the case at hand is the length of time after Foster was decided that the sentencing occurred.Moore was sentenced two weeks post Foster. Kimble was sentenced approximately nine months post Foster. That said, we do not find that that difference makes Moore distinguishable from the case at hand. Thus,Moore and its dictates are applicable.
 {¶ 100} As such, while trial courts now, pursuant to Foster, have "full discretion" in sentencing and can consider any factor in sentencing, citation to a specifically excised subsection of the felony sentencing statute should not be done. Id. at ¶ 9. Citing to excised portions of the statute, which in this instance was the citation to "R.C. 2929.14(B)", not only calls into question whether the trial court is following the requirements of Foster, but also calls into question whether the trial court is aware of the Foster holding. Id at ¶ 9, 14. We urge trial courts to no longer cite to the excised portions that were rendered unconstitutional by Foster. That said, there is nothing preventing trial court's from considering the factors enumerated in those excised portions. It is statutory mandates, i.e. statutory judicial fact finding that is not allowed. A trial court could utilize those same factors in its discretion. Here, we cannot determine which the trial court was utilizing. Therefore, on the basis ofMoore, this assignment of error has merit. The sentence is vacated and the cause remanded for resentencing.
 CONCLUSION {¶ 101} For the foregoing reasons, the conviction is hereby affirmed. However, the sentence is vacated pursuant to Foster and the case is remanded to the trial court for resentencing.
Donofrio, J., concurs.
 Waite, J., concurs. *Page 1